MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental fights (TPR) of Leila N. and Michael H., the biological parents of Raymond O., born June 1989. The Department of Children and Families (DCF) obtained custody of Raymond through an Order of Temporary Custody (OTC) dated February 13, 1998. On September 30, 1998, after hearing, the court found Raymond to be a neglected child, and committed him to DCF's care: Raymond has been maintained in DCF custody since that date, pursuant to court orders. On December 11, 2000, DCF filed the TPR petitions at issue. The TPR petition against Michael H. alleges the grounds of abandonment and lack of an ongoing parent-child relationship; the petition against Leila N. alleges the sole ground of failure to rehabilitate. For the reasons stated herein, the court finds these matters in favor of the petitioner.
Trial of this highly-contested matter took place on October 17, 18 and 19, 2001. The petitioner, the respondent mother and the child were vigorously represented by counsel. Leila N. was in attendance throughout, but Michael H. made no appearance during these proceedings.[2]
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over this matter. Notice of the proceedings was provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of the child.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR CT Page 2 social study and addendum,[3] and the other documents submitted in evidence, consisting of specific steps and expectations, court documents, treatment records, interactional psychological evaluations of Leila N. and Raymond, and a placement report. The court has utilized the applicable legal standards[4] in considering this evidence and the testimony of the witnesses, who included the foster mother, a substance abuse treatment worker, and a DCF employee.[5] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. LEILA N.
Leila N. was born on January 5, 1971, and attended school through the eighth grade. She has occasionally worked in a laundry, as a cleaner and as a cashier, although she has had long periods of unemployment.[6]
(Exhibits 18, 19, 20, 21, 22, 25, 26.) Leila N. had a brief relationship with Raymond's father, Michael H.: however, this relationship ended prior to Raymond's birth on June 1989. (Exhibit 27.)
Leila N. began intravenous use of heroin at age fifteen. While she has also used cocaine from time to time, Leila N.'s heroin use has become chronic, and has had a significant negative impact upon her adult life. (Exhibit 20.)
Leila N. has been known to DCF since the early 1990's, when she was referred to Klingberg Family Centers for Intensive Family Preservation services to address her manifest deficiencies in parenting skills as well as her substance abuse issues.[7] (Testimony of Thomas S.) As noted above, DCF obtained custody of Raymond through an OTC (Cohn, J.) entered on February 13, 1998, approximately four months prior to the child's ninth birthday.[8] (Exhibit 25.) On that date, the court also issued specific steps for Leila N., as an aid in facilitating Raymond's return to her custody.[9] Inter alia, these steps required Leila N. to keep her whereabouts known to DCF; visit the child as often as DCF permits; participate in counseling; avoid involvement with the criminal justice system; secure and maintain adequate housing and legal income. The steps further specifically directed Leila N. to avoid substance abuse; submit to substance abuse assessment, successfully complete substance abuse treatment, follow recommendations regarding treatment, aftercare, and relapse prevention. (Exhibit 1.) On September 30, 1998, after hearing, the court (Keller, J.) found Raymond to be a neglected child, upon allegations that he was not receiving adequate care concomitant to Leila N.'s continued drug use. Raymond was committed to DCF custody, and the court again ordered specific expectations for Leila N. to follow with regard to reunification. These expectations largely reiterated the February 1998 steps, and added definite obligations to participate in CT Page 3 parenting, individual and family counseling, with intensive [family] preservation services; participate in inpatient drug treatment; and cooperate with psychiatric evaluation. (Exhibit 2.) Approximately one year later, on September 13, 1999, the court (Swienton, J.) ordered a third set of specific steps for Leila N., repeating the earlier criteria and further requiring her to participate in substance abuse counseling through Hartford Behavioral Health (HBH); submit to random drug testing; and obtain services through the Institute for Hispanic Families, Supportive Housing for Recovering Families, and Hogar Crea, if recommended by HBH. (Exhibit 3.)
Throughout the years, Leila N. has had multiple opportunities to attend and complete substance abuse treatment. DCF had referred Leila N. to the Wheeler Clinic for substance abuse evaluation and treatment on several occasions both prior to and following Raymond's neglect adjudication in September 1998, but the respondent never followed through with this agency. (Testimony of Thomas S.) The evidence reflects, however, that Leila N. has followed through with other treatment providers, and that she has undergone multiple admissions to other facilities for detoxification and treatment in a continuing, but still unsuccessful, effort to overcome her heroin addiction. In June 1998, when she was admitted to the Hartford Dispensary (HD) for the third time, Leila N. reported having participated in a total of seven prior treatment experiences, including an attempt at methadone maintenance in 1997. (Exhibit 18.) In December 1998, about two months after Raymond's neglect adjudication, Leila N. was discharged from HD treatment, Leila N. then participated in aftercare services provided through Blue Hills Hospital and the Alcohol and Drug Rehabilitation Center (ADRC). (Exhibit 19.)
Unfortunately, notwithstanding these interventions and services provided by these treatment centers, Leila N. returned to her drug-centered lifestyle, and began using increasing amounts of heroin. In August 1999, she returned to HD for additional treatment. While Leila N. has been relatively cooperative with this most recent round of substance abuse treatment, she remains in need of intensive substance abuse care, notwithstanding the services she has received in the past. Most recently, Leila N.'s addiction has been measured at a "severe" level, according to the substance abuse providers at the Hartford Dispensary. (Exhibits 20, 21, 22; Testimony of Carolyn D.)
Leila N., Raymond, and their relationship have twice been evaluated by Eneida Silva, Ph.D., a licensed clinical psychologist. The first evaluation, in April of 2000, was requested by D.C.F. At that time, Dr. Silva discerned Raymond and his mother interacted well, although there was limited physical contact between them. The second evaluation, in the spring of 2001, was conducted at the order of the court. (Exhibit 26.) In CT Page 4 the opinion of this psychologist, the relationship between Leila N. and Raymond essentially resembles that of peers, rather than that of mother and son. (Exhibits 25, 27.)
Leila N. has an extensive history with the criminal justice system. She has been convicted of narcotics related offenses, violation of court orders, and burglary.[10] In addition, on March 24, 2000, after the court had imposed three sets of specific steps prohibiting further involvement with the criminal justice system, Leila N. engaged in activities that led her to be arrested and charged with assault. This charge was disposed of by nolle on June 5, 2000.
On October 26, 2000, the court (Swienton, J.) found that continuing efforts toward reunification were no longer appropriate as to the respondent mother. The petition for termination of Leila N.'s parental rights was filed on December 11, 2000. Several weeks prior to the commencement of the TPR trial, Leila N. secured employment through a temporary placement agency. She works from four in the afternoon until midnight.
I. B. MICHAEL H.
Michael H. has never appeared in this matter, nor has he ever participated in any of the hearings relating to Raymond's welfare. His date of birth is unknown. (Exhibit 17; Testimony of Thomas S.) On October 26, 2000, the court (Swienton, J.), found that continuing efforts toward reunification were no longer appropriate as to the respondent father: subsequently, the TPR petition against Michael H. was filed on December 11, 2000. On that date, to effectuate the respondent father's involvement in the trial process, the court (Keller, J.) ordered service with notice of the TPR proceedings to be delivered to Michael H. through publication.[11] On January 30, 2001, the court (Keller, J.) confirmed service by publication. Despite diligent and appropriate efforts, the petitioner has been unable to locate Michael H. or to procure his attendance at the TPR trial. (Exhibit 17; Testimony of Thomas S.)
 II. ADJUDICATION
As to the adjudicatory phase of these proceedings, the court has considered the evidence related to circumstances and events prior to December 11, 2000, the date upon which the TPR petition against Michael H. was filed, insofar as the allegations pertaining to abandonment and lack of an ongoing parent-child relationship are concerned. With regard to the allegation of failure to achieve rehabilitation pending against the respondent mother, the court has also considered the evidence and testimony related to circumstances through the close of trial, for CT Page 5 purposes of assessing the degree of rehabilitation, if any, that Leila N. has achieved.[12] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to both respondents.
II. A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts, as the term is defined at law, were made to locate and reunify both parents with Raymond, as contemplated by General Statutes § 17a-112 (1)(1). The efforts extended to the parents are clearly set forth in in Parts I., II. B. and II. C., as well as in Exhibit 27, which the court has relied on, in part, as the basis for this determination. The court further notes that on October 26, 2000, after hearing, the court (Swienton, J.) found that further efforts at reunification would not be appropriate for either respondent. In addition, based on the clear and convincing evidence produced at trial, reviewed in Parts I., II. B. and II. C., the court finds that under the circumstances of this case, both Leila N. and Michael H. are unable or unwilling to benefit from reasonable reunification efforts. § 17a-112 (j)(1). See In re Kachainy C.,67 Conn. App. 401, 411-12, ___ A.2d ___ (2001).
 II. B. STATUTORY GROUNDS FOR TERMINATION — LEILA N. FAILURE TO REHABILITATE — § 17a-112 (j)(3)(B)
The petitioner alleges that Leila N.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112.[13] As Raymond was found to be neglected on September 30, 1998, the critical issue for this court is whether the respondent mother has been sufficiently rehabilitated to render her able to serve, within a reasonable period of time, as an appropriate parent for her son. Applying the requisite legal standards,[14] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case support the conclusion that the level of any rehabilitation that Leila N. has achieved, with regard to her substance abuse and addiction issues, falls short of that which would encourage the belief that at some reasonable date in the future she could assume a responsible position in Raymond's life. See In re Sarah Ann K., supra, 57 Conn. App. 448. See also In re Daniel C., 63 Conn. App. 339, 353-54, ___ A.2d ___ (2001); Inre Ashley S., supra, 61 Conn. App. 665. First, the psychological evidence clearly and convincingly establishes that Leila N. has not achieved rehabilitation in the statutory sense.[15] In the spring of 2001, Dr. Silva recognized the chronicity of Leila N.'s substance abuse issues and CT Page 6 explained that, from a psychological standpoint, this condition presented an inherently negative effect upon the respondent's ability to discharge childcare responsibilities. Dr. Silva further described Leila N.'s substance abuse as "resistant to treatment and subject to frequent relapse." (Exhibit 26.) The psychologist's observation that Leila N. tended to minimize the nature and extent of her drug addiction was supported by psychometric test results which corroborated the existence of her substance dependence disorder and propensity to abuse illegal drugs, "[d]espite her denial of current substance abuse issues. . . ." (Exhibit 26.) In addition to her heroin addiction issues, Dr. Silva also noted signs of depression in the respondent mother, further diminishing her ability to properly parent her son. Dr. Silva concluded that Leila N. appeared to be inconsistent in her ability to take responsibility for her behaviors and in her willingness to examine the impact that her history of substance abuse and neglect of her children have had on their development. She has a strong bond with her son, but her parenting skills are somewhat uneven." (Exhibit 26.) As the result of these identified conditions, Dr. Silva expressly cautioned that Leila N. remains in need of "continued substance abuse treatment, specifically aimed at relapse prevention, and from psychotherapeutic services . . . to address her interpersonal issues and depressive symptoms." (Exhibit 26.)
Furthermore, the psychological evidence is quite discouraging with regard to the foreseeability of a significant, timely improvement in Leila N.'s ability to care for Raymond. Dr. Silva noted Leila N.'s relative unwillingness or inability to effectively utilize professional services in addressing the issues of parenting and drug use which had been raised through the neglect petition. Dr. Silva specifically remarked upon Leila N.'s "significant history of noncompliance with treatment recommendations" and opined that her "failure to follow through with treatment recommendations interferes significantly with her ability to perform [as a good parent]." (Exhibit 26.) Psychologically, Leila N. possesses an inherent "personality style which leads her to seek out excitement and take risks, thereby increasing her likelihood to abuse substances. These personality attributes, combined with a high level of defensiveness and a history of addiction render her ability to remain drug-free questionable, especially without a firm commitment to rehabilitation and relapse-prevention efforts." (Exhibit 26.) Under the totality of the circumstances in this case, the court accepts Dr. Silva's cogent opinion that Leila N. remains substance addicted notwithstanding years of treatment; that she lacks awareness of the emotional needs of her pre-teen son; that she has developed only rudimentary parenting skills; and that she is not likely to benefit from additional services. (Exhibit 26.)
Second, Leila N.'s failure to achieve rehabilitation is apparent upon CT Page 7 review of the clear and convincing empirical evidence related to Leila N.'s multiple failed efforts at substance abuse treatment programs. Despite partial compliance with such programs, throughout the nearly four years that Raymond has been in foster care, Leila N. has repeatedly failed to achieve a reasonable degree of reliable control over her substance abuse. Her heroin use has actually increased during the adjudicatory period: the evidence reflects that Leila N. was using four bags of heroin per day before her 1998 admission to the Hartford Dispensary, but that her heroin requirements had enlarged over the years, and she was using eight to nine bags per day by the time of her readmission to the HD in 1999. (Exhibits 18, 19.) It is true that Leila N. is largely cooperative while undergoing active, highly supervised substance abuse treatment, particularly when the treatment is residential in nature. However, the treatment providers have noted that Leila N. follows a pattern of repeatedly falling into chronic relapse following discharge, because she is "poor at follow through on treatment recommendations." (Exhibit 19.)
Unfortunately, Leila N. has not yet achieved a stable level of methadone which can be relied upon to mitigate her drug cravings, although this goal is within her limitations. Compare In re Amneris P.,66 Conn. App. 337, 383 ___ A.2d ___ (2001). Leila N.'s serial addiction severity ratings, ascertained at HD from April 2000 through August 2001, consistently establish that this respondent remains in need of intensive treatment for her drug abuse, as was determined by Dr. Silva. These serial addiction ratings further demonstrate that despite methadone therapy, Leila N.'s addiction is still so severe that it approaches a threat to her life. (Exhibits 20, 21, 22.) Thus, although she has continued interest in the methadone maintenance process, and is willing to accept increases in her dosage until she reaches a therapeutic level, the evidence clearly and convincingly reveals that Leila N. persists in breakthrough substance abuse unless she resides in a structured treatment facility like the ADRC. Such conduct makes effective and appropriate parenting in the community unlikely if not impossible, and would be especially detrimental to the process of successfully raising an adolescent.
Third, although specific steps were assigned to assist Leila N. in achieving rehabilitation, the evidence clearly and convincingly indicates that she failed to fulfill a number of significant criteria necessary to addressing and resolving her substance abuse issues, and improving her parenting capacity. As described in Part I. A. and herein, Leila N. continued to use drugs notwithstanding the explicit prohibition against such behavior that was set forth in each of the three sets of steps that were imposed by the court. She has failed to successfully complete the many substance abuse treatment programs to which she has been referred, CT Page 8 prematurely discontinuing services, consistently relapsing into illegal drug use, and invariably abandoning recommendations for after-care. She avoided timely opportunities for evaluation and rehabilitation through providers such as Latinos Contra Sidas, Blue Hills Hospital, Hogar Crea, Institute for Hispanic Families, Community Solutions, and Wheeler Clinic. (Exhibit 27.) Leila N. failed to secure adequate legal income, but supported herself through various "illegal activities" such as "hustling", notwithstanding the intervention of appropriate substance abuse treatment providers. Despite the steps which proscribed further involvement with the criminal justice system, Leila N. continued to follow her pattern of unlawful behavior, leading to her arrest for assault on March 24, 2000.[16] (Exhibits 4, 19.) In addition, Leila N. inconsistently attended scheduled visits with Raymond, prior to the issuance of the October 2000 order holding that further reunification efforts were no longer appropriate. Although her compliance with the visitation protocol has improved, Leila N. showed little interest in Raymond during his first year in placement, and she failed to appear at a significant number of scheduled visits to which the child was transported in anticipation of her participation.[17] (Testimony of Joanne M.)
Given that substance abuse treatment services have been offered to Leila N. since the early 1990's, recognizing that three separate sets of specific steps were imposed by the court to provide guidance in her rehabilitative process, and acknowledging the unsatisfactory results of Leila N.'s attempts at participation in services since 1997, the totality of the evidence clearly and convincingly establishes that there is no reasonable prospect that this respondent will achieve rehabilitation in the foreseeable future. In re Amneris P., supra,66 Conn. App. 385; In re Sarah Ann K., supra, 57 Conn. App. 448. Rather, the clear and convincing evidence compels the conclusion that despite some participation in rehabilitation efforts, Leila N. remains without the qualities necessary to serve as a caretaker for Raymond, and that she lacks the capacity to develop a responsible position in his life within a reasonably foreseeable time. See In re Daniel C., 63 Conn. App. 353-54;In re Ashley S., supra, 61 Conn. App. 665; In re Sarah Ann K., supra,57 Conn. App. 448. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved the respondent mother's failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
II. C. STATUTORY GROUNDS FOR TERMINATION — MICHAEL H.
It is clear that despite due notice, the respondent father has failed to appear at or to participate in these proceedings. Accordingly, the court finds him in default. Pursuant to Practice Book § 34-2, establishing that Juvenile hearings are essentially civil proceedings, CT Page 9 the default against Michael H. establishes admission of the material facts constituting the petitioner's cause of action, conclusively determining that the petitioner has prevailed on the issues raised through the TPR petition. Bank of America, FSB v. Franco,57 Conn. App. 688, 693, ___ A.2d ___ (2000). In addition, as discussed in Parts II. C. 1. and 2, below, the clear and convincing evidence in this matter establishes that the petitioner has met her burden of proving the alleged statutory grounds for terminating Michael H.'s parental rights.
II. C. 1. ABANDONMENT — § 17a-112 (j)(3)(A)
The petitioner alleges that Michael H. has abandoned Raymond, within the meaning of § 17a-112 (j)(3)(A).[18] In the absence of evidence to the contrary, and applying the requisite legal standards,[19] the court finds this matter in favor of the petitioner.
Michael H. was briefly involved with Leila N., but he disappeared from her life months before Raymond's birth in June 1989. (Exhibit 27.) Thereafter, Michael H. has never involved himself with his son in any meaningful way. He has never communicated by phone or in writing with DCF or any other person about Raymond; has sent no gifts, cards or mementos; has provided no financial support; has not consistently displayed love or affection for the child, and has personally interacted with him only on rare occasion.[20] A review of the clear and convincing evidence focusing on Michael H.'s conduct reveals that he has consistently failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." In re Deana E., supra,61 Conn. App. 193. The evidence in this matter thus clearly and convincingly establishes that Michael H. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified In reDeana E., supra, 61 Conn. App. 193, so that the petitioner has met her burden of proving that the respondent father abandoned Raymond, within the meaning of § 17a-112 (j)(3)(A).
II. C. 2. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — §17a-112 (j)(3)(D)
The petitioner next alleges that no ongoing parent-child relationship exists between Michael H. and Raymond, and that the child's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112 (j)(3)(D).[21] In the absence of evidence to the contrary, and applying the requisite legal standards,[22] the court finds this matter in favor of the petitioner. CT Page 10
In first ascertaining whether a parent-child relationship exists between Michael H. and Raymond, the court has referenced the findings related to the ground of abandonment, set forth in Part II. C. 1. In reJonathon G., supra, 63 Conn. App. 525. It is thus clear that Raymond's daily physical, emotional, moral and educational needs have never been met by Michael H., but have always been supplied by others. The court has also considered that Raymond never asks about his biological father, and maintains no present memories of or positive feelings for him, although he does know that an individual named "Michael H." is his biological father. (Testimony of Joanne M., Thomas S.) In re Jonathon G., supra,63 Conn. App. 525. The evidence thus clearly and convincingly establishes that no parent-child relationship exists between Michael H. and Raymond.
The court is next called upon to assess whether it would be detrimental to Raymond's best interests[23] to allow additional time for a parenting relationship to be developed with Michael H. In re Jonathon G., supra, 63 Conn. App. 525. Dr. Silva credibly opined that it is in Raymond's best interests to remain under the custodial care of his current foster mother, in whose home he has found comfort, strength, security and guidance for so many years.[24] Raymond's attorney has also argued that this placement should remain in effect, as the evidence fully supports the inference that the child's best interests cannot be met through extending his legal relationship to Michael H. Given this evidence, the conclusions set forth in Part III. B., and Michael H.'s lack of interest in either his son or this litigation, the court finds that it could not be in Raymond's best interests to allow more time for Michael H. to become a part of this young man's life. See In re JonathonG., supra, 63 Conn. App. 525; In re John G., supra, 56 Conn. App. 22.
As the clear and convincing evidence in this case establishes that no ongoing parent-child relationship exists between Michael H. and Raymond, and that it is not in Raymond's best interests to allow more time for him to develop a relationship with his biological father, the petitioner has met her burden of proof under § 17a-112 (j)(3)(D).
 III. DISPOSITION
The court having concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M., 60 Conn. App. 96, 103, 758 A.2d 863, cert. denied,255 Conn. 903, 762 A.2d 909 (2000). In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III. A. SEVEN STATUTORY FINDINGS
CT Page 11
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights.[25] See In re Jonathon G., supra,63 Conn. App. 528.
III. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — §17a-112 (k)(1)
Multiple timely and appropriate services were provided for Leila N. prior to October 26, 2000, when the court (Swienton, J.) found that continued efforts toward reunification were no longer appropriate for either parent. Services provided to Leila N. included transportation and visitation assistance; referrals to counseling and substance abuse therapy at Latinos Contra Sida, Institute for Hispanic Families, Blue Hills Hospital, Hartford Dispensary, Hartford Behavioral Health, Wheeler Clinic, ADRC, Hogar Crea, Community Solutions and John Dempsey Hospital; housing assistance through referrals to a supervised living program, to Crossroads, and to Supportive Housing for Recovering Families. (See Part II. A.) Given his non-appearance in the court proceedings involving Raymond, and given his lack of contact or cooperation with DCF, no services were offered to Michael H. (Exhibit 27; Testimony of Thomas S.) Extension of such services to the respondent father would have been unreasonable and unwarranted, under the circumstances of this case.
III. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112(k)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, given the services extended to Leila N., as recounted in Parts I. A., II. B., and III. A. 1.; given the court's finding on October 26, 2000 that continued efforts toward reunification were no longer appropriate for either parent; and given Michael H.'s lack of participation in or attention to hearings involving. Raymond's well-being.
III. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
As described in Part II. B., Leila N. only partially complied with the court's specific steps, and violated her prohibition against involvement with the criminal justice system through her arrest in March 2000. She has failed to consistently maintain legal income or stable housing. She has not satisfactorily completed a substance abuse treatment program, and has repeatedly relapsed into use of illegal drugs. She has not completed CT Page 12 any personal counseling or parenting education programs. (Exhibit 27.) No orders were in effect in this case as to Michael H.
III. A. 4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112 (k)(4)
Raymond O. maintains love and affection for his biological mother, despite his years in placement, and it is clear that she is very emotionally attached to him as well. Although he is extremely comfortable in his foster home, Raymond has stated, on more than one occasion, that he wishes to live with Leila N.[26] (Exhibits 25, 26.) He looks forward to scheduled visits with the respondent mother, and is disappointed when they do not transpire. He has an extremely close relationship with his younger sisters, whom he sees frequently. (Exhibits 27, 28.)
Raymond also has developed a firm and loving bond with his foster mother Joanne M., with his foster siblings, and with his foster mother's companion, Louis. Raymond now' understands that he is an integral part of his foster family. (Testimony of Joanne M., Thomas S.) The child has no emotional ties to Michael H., although he knows the name of his biological' father. (Testimony of Joanne M.)
III. A. 5. AGE OF THE CHILD — § 17a-112 (k)(5)
Raymond O. was born on June 1989. He is twelve and a half years old.
III. A. 6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — §17a-112 (k)(6)
Neither Leila N. nor Michael H. has maintained adequate contact with Raymond or the foster mother regarding the child's status during his stay in foster care: Michael H. has never contacted DCF to obtain information about his child, either. While Leila N. has made recent' efforts to visit with her son on a consistent basis, the evidence reveals that in the past she was responsible for missing a number of monthly opportunities for contact with him, as discussed in Part II. B. (Testimony of Joanne M., Thomas S.) Neither parent has made realistic and sustained efforts to conform his or her conduct to even minimally acceptable parental standards. Giving either parent additional time would not likely bring their performance as parents within acceptable standards, sufficient to make it in Raymond's best interests to be subject to reunification.
 III. A. 7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILD — § 17a-112 (k)(7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented either parent from maintaining a relationship CT Page 13 with Raymond. Although DCF scheduling errors resulted in the loss of a number of visitation opportunities between Leila N. and her child, the respondent mother also caused a number of scheduled visits to be missed. (Testimony of Joanne M.) When DCF reduced frequency but increased the duration of mother-child visits in the fall of 2000, this schedule change was reasonably based upon the court's order that further reunification efforts were not appropriate.
III. B. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
The court is next called upon to decide whether termination of the parental rights of Leila N. and Michael H. would be in Raymond's best interests.[27] Applying the appropriate legal standards[28] to the facts which are clearly and convincingly apparent in this case, the court finds that granting the TPR petitions will best serve the child.
In deciding this issue, the court examined multiple relevant factors including Raymond's need for sustained health, stability and continuity of his environment; the length of his stay in foster care; the nature of his relationship with his foster mother; the nature of his relationship and genetic bond with his biological parents, and the degree of contact maintained with them. In re Savanna M., 55 Conn. App. 807, 816,740 A.2d 484 (1999) (genetic bond between biological parent and his or her child, although not determinative of the issue of the best interests, should be considered). See also In re Alexander C., supra,60 Conn. App. 559; In re Shyina B., supra, 58 Conn. App. 167. In this matter, the court has balanced the child's intrinsic need for stability and permanency against the value of maintaining a connection with his biological parents. Pamela B. v. Ment, 244 Conn. 296, 313-314,709 A.2d 1089 (1998) (child's physical and emotional wellbeing must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Raymond's best interests to continue to maintain any legal relationship with either of his biological parents. Raymond has been in the care of his experienced foster mother since he was eight years old: he is now twelve and a half. The stability and consistency which have been provided to him through his loving relationship with his foster mother, foster siblings and extended foster family, and the secure home into which he has been welcomed, have all sustained and nourished this child. Although Raymond continues, from time to time, to demonstrate some noncompliant behavior in his school setting, the nature and extent of his aggressive and hostile conduct has clearly diminished as the result of professional counseling and his exposure to consistent limit-setting in his foster home. Raymond has obviously benefitted from the structured and predictable environment in CT Page 14 which he currently resides: his academic progress provides a tangible measure of his willingness and ability to meet appropriately high expectations.
Raymond is no longer the sad, quiet, introspective and oppositional child who entered foster care. Now, in his adolescence, he largely conforms to appropriate behavioral norms, takes pride in his appearance, and realistically dreams of college and a professional career. Under his foster mother's direction, Raymond participates in a number of extra-curricular and family-related activities, and attends foster-child support groups: all these endeavors have assisted him in developing a valuable degree of self esteem, self-efficacy and strength. (Exhibits 25, 26, Testimony of Joanne M.) Joanne M. is willing to continue Raymond O.'s communication with Leila N., especially if this takes place through the exchange of cards and letters. Joanne M. loves Raymond, and sincerely desires to adopt him so that he will become a formal and permanent part of her family, where he can grow and develop in a healthy manner during the waning years of his childhood, and experience his transition into adulthood without questioning who will provide his care in the future. (Testimony of Joanne M.)
This court sympathizes with Leila N., who is clearly afflicted with a serious substance abuse problem, an addiction which existed before her son was born and which persisted throughout his early years, and continued during the pre-trial period: the court further notes the respondent's vigorous defense of this matter. In re Ashley S., supra,61 Conn. App. 667. However, it is patently obvious Leila N. has not yet developed the ability to serve as a reliable parental resource for Raymond, and she is not likely to acquire the requisite skills in the near future. On the other hand, Raymond's foster mother has provided him with consistent care and behavior management, leading Dr. Silva to conclude that, from a psychological standpoint it is in the child's best interest to remain in Joanne M.'s custody, and that "adoption is in Raymond's best interests at this time." (Exhibit 26.)
Raymond's fantasies of reunification with Leila N. have been largely replaced by a more pragmatic appreciation of his biological mother's minimal parenting capabilities. While Raymond looks forward to visits with Leila N., enjoying the gifts and treats she brings to him, it is equally clear that he becomes emotionally distressed when she fails to attend scheduled meetings. Raymond is now old enough to recognize that he cannot depend upon his biological mother for, the consistency and predictability he deserves and requires from a parental figure. As he approaches his thirteenth birthday, this honor student has the ability to savor his kinship and love for Leila N. while recognizing that her inherent limitations, including her chronic relapses into heroin abuse, CT Page 15 render her functionally unable to fill a parental role.
It is important for all to acknowledge that parenting involves more than just visiting and bringing pizza or gifts to entertain a child. Parenting involves nurturing, care, and showing support for the child in question. The circumstances of this case clearly and convincingly reflect that while her son has been in foster care, Leila N. has never reached the point where she can be relied upon to meet these critical needs. Our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal(84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). It is not in Raymond's best interests to allow him to languish, awaiting her development of such abilities, while he occupies the uncomfortable position of being forced to continuously choose between his biological mother and his foster mother. He "should not be further burdened by having to wait for [his] mother to achieve the level of competency necessary" to serve as his parent. In re Amneris P., supra, 66 Conn. App. 385. This court is therefore constrained to join Raymond's attorney and Dr. Silva in concluding that this child is entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of his biological parents as caretakers. Severance of his legal bonds to Leila N. and Michael H., freeing Raymond for adoption, will best eliminate the stressful limbo which persists while the TPR issues remain before this court.
Balancing Raymond's intrinsic need for stability and permanency against the benefits of maintaining a legal connection with either Leila N. or Michael H., the clear and convincing evidence in this case militates in favor of termination of the respondents' parental rights. Pamela B. v.Ment, supra, 244 Conn. 313-314. Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Leila N. and Michael H. is in Raymond's best interests.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of Raymond's sense of time, his need for a secure and permanent environment, the relationship he has with his foster mother, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing CT Page 16 evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Leila N. and Michael H. are hereby terminated as to the child Raymond O.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Raymond, for the purpose of securing an adoptive family or other permanent placement for him. That primary consideration for adoption of Raymond shall be offered to his current foster mother.
That pending Raymond's adoption, the parties shall work together to effectuate continuation of the present visitation schedule, in accordance with the child's wishes as expressed by his counsel at trial.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law.
BY THE COURT,
N. Rubinow, J.